# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Mark Filip | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 02 C 8474 | **DATE** | 6/22/2004 |
| **CASE TITLE** | Robert Vonckx vs. Allstate Insurance Company | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] ENTER MEMORANDUM OPINION AND ORDER: For the reasons set forth in the attached Memorandum Opinion and Order, Allstate's motion for summary judgment is Granted.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | |
|---|---|---|---|
| | No notices required, advised in open court. | | **Document Number** |
| | No notices required. | number of notices | |
| | Notices mailed by judge's staff. | | |
| | Notified counsel by telephone. | JUN 2 3 2004 | |
| ✓ | Docketing to mail notices. | date docketed | |
| ✓ | Mail AO 450 form. | AML | 32 |
| | Copy to judge/magistrate judge. | docketing deputy initials | |
| | | date mailed notice | |
| TBK | courtroom deputy's initials | | |
| | | Date/time received in central Clerk's Office | mailing deputy initials |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| ROBERT VONCKX, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 02 C 8474 |
| | ) | |
| | ) | Judge Mark R. Filip |
| ALLSTATE INSURANCE COMPANY, | ) | |
| | ) | Magistrate Judge Mason |
| Defendant. | ) | |

**DOCKETED**
**JUN 23 2004**

## MEMORANDUM OPINION AND ORDER

Plaintiff Robert Vonckx ("Vonckx" or "Plaintiff") brings this action against his former

employer, Allstate Insurance Company ("Allstate" or "Defendant"). Plaintiff alleges that Allstate

terminated his employment in violation of the Age Discrimination in Employment Act

("ADEA"), 29 U.S.C. § 621 *et seq.* Allstate has moved for summary judgment pursuant to

Federal Rule of Civil Procedure 56. As explained below, Allstate's motion is GRANTED.

## I.    FACTS[1]

---

[1] The relevant facts are taken from the parties' respective Local Rule 56.1 ("L.R. 56.1")
statements of facts and exhibits. L.R. 56.1 requires that statements of facts contain allegations of
material fact (not legal conclusions) and the factual allegations must be supported by admissible
record evidence. *See* L.R. 56.1; *Malec v. Sanford,* 191 F.R.D. 581, 583-85 (N.D. Ill. 2000). The
Seventh Circuit has "consistently and repeatedly upheld a district court's discretion to require
strict compliance" with L.R. 56.1. *Bordelon v. Chicago Sch. Reform Bd. of Trs.,* 233 F.3d 524,
527 (7th Cir. 2000). Each party has objected to a number of L.R. 56.1 statements made by the
other. Where the parties disagree over the relevant facts, the Court sets forth the competing
versions. In addition, the Court, as it must, resolves genuine factual ambiguities in Plaintiff's
favor. *Foley v. City of Lafayette,* 359 F.3d 925, 928 (7th Cir. 2004). However, precedent teaches
that alleged factual conflicts should not be resolved in a party's favor if the alleged ambiguities
arise from affidavit or deposition statements that contradict earlier sworn testimony by the party.
*See, e.g., Patterson v. Chicago Ass'n for Retarded Citizens,* 150 F.3d 719, 724 (7th Cir. 1998)
(collecting cases); *Diliberti v. United States,* 817 F.2d 1259, 1263 (7th Cir. 1987). Moreover,

1

32

Plaintiff began work for Allstate in a full-time, permanent position in December 1995. (Defendant's L.R. 56.1(a) Statement of Facts ("Def. SF") ¶ 8.) He was assigned to the Local Area Network Team in Allstate's Claim Technology Services Department ("CTS"). (*Id.*) Plaintiff's primary duties involved deploying PCs and maintaining Novelle servers, although he eventually took on other responsibilities. (Plaintiff's L.R. 56.1(b) Statement of Additional Facts ("Pl. SAF") ¶¶ 8-9.) At the times relevant to the instant case, Plaintiff was assigned to the Testing and Architecture Support Team ("TAS" or "TAS team"), one of a number of teams within CTS's computing platform management division. (*See* Def. SF ¶ 9.) There, Plaintiff started to develop computer forms and applications for Microsoft Outlook. (Pl. SAF ¶ 13.) He also maintained another Microsoft product, the Visual Source Safe Library ("VSSL"), which was a highly secure repository for source code developed by Allstate. (*Id.* ¶ 11.) Plaintiff also worked on the TAS team's problem management system. (*Id.* ¶ 77.) It is undisputed that Plaintiff was a talented programmer and that many Allstate employees sought his technical assistance. (*Id.* ¶¶ 14, 21-25; Def. SF ¶¶ 10-11.)

In December 1998, Paul Balazs ("Balazs") became Plaintiff's team leader on the TAS team. (Def. SF ¶ 9.) By all accounts, Plaintiff was a good employee for most of the period he worked under Balazs's supervision, and Balazs rated Plaintiff highly. For example, in May 2000, Balazs rated Plaintiff's work for the 1999 calendar year as "exceeds all expectations." (Pl. SAF

---

where statements of fact or responses are unsupported or otherwise are made in violation of L.R. 56.1, the Court has disregarded the improper assertion or denial and accepted the conforming version as true. *See, e.g., Brasic v. Heinemann's Inc.*, 121 F.3d 281, 284 (7th Cir. 1997). The Court notes that Plaintiff in particular has improperly denied a number of Defendant's properly supported factual assertions. The Court specifically addresses the more egregious violations of L.R. 56.1, as explained further below.

¶¶ 20-21.) In March 2001, Balazs again gave Plaintiff an "exceeds" rating on his yearly performance evaluation. (*Id.* ¶¶ 22, 24.) The "exceeds" rating is the highest an Allstate employee can receive. (Def. SF ¶ 10.)

The events giving rise to this suit began shortly after Plaintiff's March 2001 performance evaluation. Plaintiff had developed a Microsoft Outlook program for use by the approximately 300 employees within CTS. (Pl. SAF ¶ 16.) In April 2001, Balazs instructed Plaintiff to install the program—known as "Move, Add, Change"—on computers used by the Multiple Access Integration Team ("MAI team" or "MAI"), an Allstate department outside CTS. (*Id.* ¶ 26; Def. SF ¶ 12.) Allstate had recently created the MAI team to develop web sites enabling consumers to buy insurance over the Internet. (Def. SF ¶ 12.) The "Move, Add, Change" program would facilitate Allstate's efforts to hire and process new employees into the MAI team by consolidating into one system all information regarding the new employees' administrative needs. (*Id.*)

On April 30, 2001, Plaintiff met with members of the MAI team. (Pl. SAF ¶ 30; Def. SF ¶ 13.) The parties dispute what happened at this meeting and immediately afterwards. Plaintiff claims that no one on the MAI team gave him a deadline or otherwise indicated any pressing need for the program. (Pl. SAF ¶ 31.) Allstate alleges that Lydia Rosado ("Rosado"), one of the MAI team application specialists, told Plaintiff that MAI team resource managers needed to be able to use the "Move, Add, Change" program "right away," because the team was hiring some new employees. (Def. SF ¶ 13.) At any rate, it is undisputed that Plaintiff presented the MAI team with the program sometime that same day. (*Id.* ¶ 14.) Plaintiff asserts that, due to technical problems, he was unable to successfully install the program on the MAI team's computers. (Pl.

3

SAF ¶¶ 37-39.) He also claims that he informed Balazs about the unsuccessful installation. (*Id.* ¶ 40.)

One of the parties' main points of contention is whether the program was password protected when the MAI team received it. The parties agree that when Plaintiff had originally developed the program, he placed password protection on it. (Def. SF ¶ 20.) Any program user would therefore have needed Plaintiff's password to access the source code. (*Id.* ¶ 21.) Sometime shortly after Plaintiff installed the "Move, Add, Change" program at MAI, Rosado attempted to access and modify the program's source code. (*Id.* ¶ 14.) Defendant argues that Rosado was unable to successfully modify the program's source code because the program was password protected. (*Id.*) Plaintiff disputes this, claiming that he had removed the password protection before giving the program to the MAI team. (Pl. SAF ¶¶ 44-45.)

On May 1, 2001, Rosado emailed Plaintiff and requested that he provide the source code for the "Move, Add, Change" program. (*Id.* ¶ 32; Def. SF ¶ 15.) Rosado copied her email to another MAI team member, Lizzie Jones ("Jones"), who had been present at the April 30 meeting. (Def. SF ¶ 15.) Rosado's email to Plaintiff, in relevant part, reads as follows:

> I need to know the following so that we can take over the project. We know you will not be available all of the time we need to make changes to the project because you report to a different team. We want to learn to change the form, contacts, group names, and MAI if that were to change also.
> ***
> Go over each form, its functionality, the coding behind it (the steps to make each button function), and how we can make changes to it.
> . . . (W)e need to know how everything works in order to be able to support it. If you would rather copy the forms from your folder instead of using the ones I created, it is fine, but we need to know the details behind it.

(*Id.*) Plaintiff then replied to Rosado's email, stating, "Although we will not be able to give you the source code, we would be happy to partner with you in making this application work for all

4

areas of TSSFS."[2] (*Id.* ¶ 17.) Plaintiff's email response was copied to Jones. (*Id.*)

Plaintiff contends that he met with Rosado right away after her email and attempted to fix the problems with the program. (Pl. SAF ¶ 32.) Plaintiff claims that he and Rosado "struggled" to get the program files to operate on Rosado's system, but ultimately they were unsuccessful due to technical problems. (*Id.* ¶¶ 33-34.) Despite admitting that he sent the aforementioned email response to Rosado, Plaintiff asserts that he provided "all the source and application code that he had," fully discharging his duties with respect to the MAI team. (*Id.* ¶ 35.) Rosado, Plaintiff claims, never requested the source code again after their failed troubleshooting efforts. (*Id.*) Defendant, on the other hand, disputes that Plaintiff made any attempt to meet with Rosado or provide the requested access information and further explains that Plaintiff never informed Balazs of any problem with the installation. (Defendant's Response to Pl. SAF ("Def. Resp.") ¶¶ 32-47.)

On May 29, 2001, Allstate hired Saifur Rahman ("Rahman"), age 26, as a new member of the TAS team. (Pl. SAF ¶¶ 74, 76; Def. SF ¶ 48.) Balazs announced the hire to the TAS team, and informed them that Rahman would be doing web development, some administrative work, and some work on TAS's problem management system. (Pl. SAF ¶ 76; Def. SF ¶ 49.) Balazs did not indicate that any of Plaintiff's job duties would be changing because of Rahman's hire. (Def. SF ¶ 49.)

In early June 2001, the password issue again took center stage. In his deposition, Balazs testified that, from the time Plaintiff undertook the MAI assignment until early June, Balazs

---

[2] It is unclear from the record what "TSSFS" is, but this ambiguity is irrelevant to the Court's disposition of this motion.

assumed that the MAI team had full access to the systems and was happy with Plaintiff's installation of the "Move, Add, Change" program. (Def. SF ¶ 18.) Plaintiff disagrees that Balazs could have had this assumption, because he claims to have told Balazs in early May that the program installation was unsuccessful. (Pl. SAF ¶ 40.) Whatever Balazs may have believed in May and early June, however, it is undisputed that on June 6, 2001, Balazs received a copy of an email that Jones had sent to Plaintiff regarding the program. (Def. SF ¶ 19.) Jones's email reads in part:

> [MAI has] gone beyond the set timeframe for this project. We are unable to view the code to build our code for MAI specification. *Also, we are unable to edit the forms because you have password protection on all the forms.* We understand from your message below that you want to market your process to the entire TSS/FS group, but we do not have the authority to give you a partnership with TSS/FS or any other group.
>
> Please understand that we are not trying to take credit for creating your process. However, we are interested in benefiting [sic] from tools that currently exist at Allstate. *So if there is no special official protocol regarding your tool, we would sincerely appreciate it if you would provide us with the previous[ly] requested information and any other information that we will need to model your system.* Again, please understand we will be using your process as a template.

(*Id.* (emphases added).) Jones's email also contained Rosado's previous May 1, 2001 email to Plaintiff, along with Plaintiff's response. (*Id.*)

As June progressed, Balazs clearly expressed concern with Plaintiff and the lack of progress concerning the "Move, Add, Change" program. Specifically, on June 20, 2001, Balazs emailed Plaintiff and requested that he provide the password to the MAI team. (*Id.* ¶ 22.) Balazs stated in his email that "the MAI resource managers have made a simple request to have access to the code and forms so that they can modify the [Move, Add, Change] application to fit their work processes." (*Id.* ¶ 25.) In addition, Balazs reminded Plaintiff that "[a]s an Allstate

employee, you have been compensated for your efforts in developing this system." (*Id.* ¶ 26.)

Finally, Balazs warned that he had "grown weary in [sic] discussing this issue with you any

further. We have discussed this issue repeatedly over the last week with no positive outcome.

*This has become a job performance issue, and I will treat it as such.*" (*Id.* (emphasis in

original).) Balazs's email also contained Rosado's[3] previous email to Plaintiff, along with

Plaintiff's reply to Rosado. (*Id.*)

Later the same day, Plaintiff emailed a reply to Balazs.[4] (*Id.* ¶ 28.) In the email, Plaintiff

---

[3] Although not material to the disposition of this motion, the Court notes that Plaintiff denies Defendant's contention that Balazs's email to Plaintiff also contained a copy of Jones's prior email to Plaintiff. Plaintiff claims that the first he had seen of the Jones email was when "it was delivered to [his] door via the overnight service" before a 2001 IDES hearing. (Plaintiff's Response to Def. SF ("Pl. Resp.") ¶ 27; Vonckx Tr. ("Def. SF Ex. B") at 174-75.) This denial seems incredible, given that a review of the record reveals that the Jones email (dated June 6, 2001) is forwarded as part of a full chain of emails, the latest of which is from Plaintiff himself (dated June 20, 2001). (Def SF Ex. B, Tab 5.) Moreover, Plaintiff admits the contents of Defendant's ¶ 19, which explains that Balazs received the Jones email and quotes extensively from Jones's email. (Def. SF ¶ 19; Pl. Resp. ¶ 19.) This issue, however, is not material to the result in disposition of the motion.

[4] Plaintiff improperly denies the content of his own email response and Defendant's factual assertions regarding the email. (Pl. Resp. ¶ 28 ("Admit that Plaintiff sent Balazs an email . . . but . . . den[y] each and every remaining allegation . . . as said [p]aragraph violates Local Rule 56.1 by failing to set forth short paragraphs and is argumentative.").) Plaintiff provides no factual support for his denial, but instead cites caselaw. While Defendant likely should have set forth the multiple facts contained in ¶ 28 in separate paragraphs, *see* L.R. 56.1(a), that rule is for the Court's benefit, so that it will not have to "scour the record looking for factual disputes." *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 921-22 (7th Cir. 1994) (collecting cases). Allstate supported each factual assertion in ¶ 28 with accurate and clear citations to the record—and the Court had no difficulty analyzing the relevant factual assertions, even though they were set forth in one paragraph. The Court therefore exercises its discretion not to strike or otherwise ignore Defendant's factual assertions contained in ¶ 28. *See, e.g., Malec*, 191 F.R.D. at 583.

Plaintiff's citation of caselaw, rather than facts in the record, to attempt to support his factual denial is improper. *See Bordelon*, 233 F.3d at 529 (Noting that a district court is not "required to wade through . . . legal argument in search of a genuinely disputed fact."). Moreover, Allstate's record citations in ¶ 28 properly support each of its factual assertions (in one instance, by Plaintiff's own deposition testimony), and thus Plaintiff's assertion that the

cryptically stated only that "Steve Wright is the owner of the PCCSO[5] system, NOT me." (Def. SF ¶ 28 (capitalization in original).) Plaintiff did not provide Balazs with any password that would allow the MAI team to access his program's source code. (*Id.*)[6]

Following the email exchange, at around 4:00 p.m. the same day, Plaintiff had a face-to-face conversation with Balazs in which Balazs again requested the password. (Def. SF ¶ 32.) Plaintiff responded that he was unable to give Balazs the password at that time, and he provided no reason for his inability to comply with Balazs's request.[7] (Def. SF ¶ 33.)

---

remaining allegations in ¶ 28 are "argumentative" is unfounded. As Plaintiff has improperly and inadequately denied the factual allegations contained in ¶ 28, the entire paragraph is deemed admitted.

[5] It is unclear from the record what "PCCSO" is, but this ambiguity is irrelevant to the Court's disposition of this motion.

[6] Despite Plaintiff's reference to Steve Wright, Mr. Wright was not assigned to the TAS team (and therefore did not answer to Balazs). (Def. SF ¶ 28.) As such, Mr. Wright was not working on the "Move, Add, Change" program at Balazs's behest. (*Id.*)

[7] Plaintiff denies that the conversation unfolded this way, and he again calls Defendant's allegations "argumentative." (Pl. Resp. ¶ 33.) To support his denial, Plaintiff cites to his own and Balazs's deposition testimony. (*Id.*) The cited portion of Balazs's testimony, however, does not appear to relate to the conversation in question, but rather appears to relate to an earlier communication. (Balazs Tr. ("Def. SF Ex. G") at 90.) Nonetheless, viewed generously, the cited portions of Plaintiff's deposition (taken July 29, 2003) seem generally to support Plaintiff's denial. (Def. SF Ex. B at 150, 162, 169.) However, Allstate provides supporting citations to the transcript of Plaintiff's sworn testimony at his August 30, 2001, hearing before the Illinois Department of Employment Security ("IDES") concerning his firing. (IDES Hearing Tr. ("Def. SF Ex. D").) The Court has reviewed the entire transcript of the IDES hearing, including Plaintiff's sworn testimony there. Plaintiff's sworn testimony at that hearing—given some two years before his deposition in this case—tells a materially different story regarding the conversation. At the hearing, Plaintiff repeatedly contradicted his litigation position before this Court that Plaintiff did not have any password and had so informed Balazs. (Def. SF Ex. D at 9 (Plaintiff testifying that on June 20, 2001, "I told him [Balazs] that I was unable to give him the password *at that time*.") (emphasis added); 10 ("I was unable to explain the reason to him at that time."); 8 ("I was under the impression that, um – we at CTS were not issuing a password to other departments"); 10 ("I did not give him a reason, but I did not think that it was taken that it

Plaintiff took off from work the following two days, June 21 and 22, 2001, to take care of his terminally ill grandfather. (Pl. SAF ¶¶ 61-62; Def. SF ¶ 37.) At around 9:00 a.m. on June 21, Plaintiff left a message in Balazs's voicemail.[8] (Def. SF ¶ 38.) Plaintiff told Balazs that he was "unable to provide answers to the questions." (*Id.* ¶ 39.) It is undisputed that Plaintiff did not give Balazs the password on June 21, and he did not try to call Balazs again that day because Plaintiff "figured that [the one voicemail] was good enough." (*Id.* ¶¶ 38-40.)

On June 22, Plaintiff made no further attempt to contact Balazs. (*Id.* ¶ 40.) Plaintiff did, however, participate in a telephone conference regarding the password issue with Jennifer Noe ("Noe"), Plaintiff's employee advocate, and Joan Naughton-Gerdes ("Naughton-Gerdes"), Plaintiff's direct supervisor. (Pl. SAF ¶¶ 64-65.) While details of the phone call are scant, it is undisputed that Allstate changed the password issue from being a performance problem to being an issue of employee misconduct on Plaintiff's part. (*Id.* ¶ 66.)

When Plaintiff came to work on Monday, June 25, he met with Balazs and Noe. (Def. SF ¶ 42.) Marina Graf ("Graf"), an Allstate human resources consultant, and Michael Thomas ("Thomas"), Allstate's Assistant Vice President of Application Services, also participated. (*Id.*) Plaintiff was informed that Allstate was suspending him pending an investigation. (*Id.*) Despite

---

was a refusal.").) As explained further below, because the factual assertions in Defendant's ¶ 33 are consistent with Plaintiff's earlier sworn testimony at the IDES hearing, Seventh Circuit precedent teaches that a litigant cannot attempt to create a factual issue so as to forestall summary judgment by contradicting prior sworn testimony through so-called sham affidavits and new deposition assertions. *See, e.g., Patterson*, 150 F.3d at 724; *Diliberti*, 817 F.2d at 1263.

[8] Plaintiff admits that he did not provide a password in his voicemail message but denies the remainder of Defendant's ¶ 39 as "argumentative" without citing to any contradicting record evidence. (Pl. Resp. ¶ 39.) Allstate supports its factual assertions in ¶ 39 by citing Plaintiff's own deposition testimony. (Def. SF Ex. B at 87, 171-72, 176-77.) Plaintiff's denial is improper, and the Court deems admitted the contents of Defendant's ¶ 39.

this, Plaintiff again failed to provide a password at any time that day. (*Id.* ¶ 43.)

On June 26, 2001, Noe sent a letter to Thomas in which she stated that Plaintiff's direct management group had lost confidence in Plaintiff's ability to perform his job because he was "deliberately ignoring a request to provide necessary password information to the [MAI Team] leadership group." (Def. SF ¶ 45.)[9] Later the same day, Plaintiff was terminated for employee misconduct for failing to provide the requested password despite repeated requests. (*Id.* ¶ 46.) Plaintiff was forty-three years old at the time of his termination. (Def. SF ¶¶ 2, 46.) So was Balazs. (Def. SF ¶ 4.)

On August 30, 2001, Plaintiff attended a hearing at the Illinois Department of Employment Security ("IDES") concerning his application for unemployment benefits. (Def. SF ¶ 23 & Ex. D (IDES Hr'g Tr.).) At the hearing, Plaintiff testified under oath about the events leading to his termination. (Def. SF ¶ 23.) When the IDES administrative referee asked Plaintiff about the password, Plaintiff repeatedly acknowledged that he had not provided any password to Balazs. (Def. SF Ex. D at 9 (Plaintiff testifying that on June 20, 2001, "I told him [Balazs] that I was unable to give him the password *at that time*.") (emphasis added); 10 ("I was unable to explain the reason to him at that time."); 8 ("I was under the impression that, um – we at CTS

---

[9] Plaintiff admits that Noe sent a letter but denies the remainder of Allstate's ¶ 45 as "conclusory." (Pl. Resp. ¶ 45.) In support, Plaintiff cites caselaw as well as his own deposition testimony. (Def. SF Ex. B at 160-61.) Plaintiff's denial is improper. Plaintiff provides no explanation for why the disputed portions of ¶ 45 are "conclusory," and his unadorned citation to caselaw does not adequately create a dispute of fact. *See Bordelon*, 233 F.3d at 529. To the extent that Plaintiff offers his deposition testimony to dispute Allstate's assertion that a password existed (and that Plaintiff failed to provide it), the Court disregards the deposition testimony because it contradicts Plaintiff's prior sworn testimony, as explained below. *See Patterson*, 150 F.3d at 724; *Diliberti*, 817 F.2d at 1263. The Court therefore deems admitted the allegations in Defendant's ¶ 45.

were not issuing a password to other departments"); 10 ("I did not give him a reason, but I did not think that it was taken that it was a refusal.").)[10] (*Id.*)

On March 13, 2002, Plaintiff filed a charge of employment discrimination with the Equal Employment Opportunity Commission ("EEOC"). (Def. SF ¶ 5.)[11] On August 26, 2002, the EEOC issued Plaintiff a right to sue letter. (*Id.* ¶ 7.) On November 21, 2002, Plaintiff filed suit in this Court, alleging that defendant Allstate discriminated against him in violation of the ADEA when it terminated his employment. (D.E. 1.)

## II.    SUMMARY JUDGMENT STANDARD

Summary judgment is proper where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The nonmovant cannot rest on the pleadings alone, but must identify specific facts, *see Cornfield v. Consol. High Sch. Dist. No. 230*, 991 F.2d 1316,

---

[10] Plaintiff admits testifying at the IDES hearing, but denies the quoted statement because of Defendant's allegedly improper citation to the record and because "said allegations lack foundation." (Pl. Resp. ¶ 23.) Plaintiff attempts to supports his denial with his subsequent contradictory affidavit, the exact same citation to the IDES transcript that Defendant cites, and caselaw. The Court had no trouble locating the quoted language in the transcript from the IDES hearing and verifying that Defendant's quotation is, in fact, accurate and relevant. (Def. SF Ex. D at 8.) To the extent Plaintiff's affidavit contradicts his sworn testimony at the IDES hearing, the Court disregards the portions of the affidavit attempting to contradict the prior testimony so as forestall summary judgment. *See, e.g., Diliberti*, 817 F.2d at 1263. Similarly, for the reasons stated above, Plaintiff's legal arguments do not suffice as proper denials of defendant's factual allegations. *See Bordelon*, 233 F.3d at 529. Plaintiff's denial is improper, and the Court deems admitted the allegations contained in Defendant's ¶ 23.

[11] In his EEOC charge, Plaintiff stated under penalty of perjury that he was discharged for allegedly failing to give a password to a computer system but "[t]he password was not within my control because I was not permitted in the building where the system was located." (Def. SF ¶ 6; Pl. Resp. ¶ 6.)

1320 (7th Cir. 1993), that raise more than a scintilla of evidence to show a genuine triable issue of material fact. *See Murphy v. ITT Educ. Servs., Inc.*, 176 F.3d 934, 936 (7th Cir. 1999) (citation omitted).

In an employment discrimination case, a plaintiff may avert summary judgment "by presenting enough evidence . . . of discriminatory motivation to create a genuine issue for trial." *Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 616 (7th Cir. 2000) (citation omitted). In deciding a motion for summary judgment, the Court can only consider evidence that would be properly admissible at trial. *See Bombard v. Fort Wayne Newspapers, Inc.*, 92 F.3d 560, 562 (7th Cir. 1996). The Court views the record and all reasonable inferences drawn therefrom in the light most favorable to the nonmovant. *See* Fed R. Civ. P. 56(c); *Foley* 359 F.3d at 928.

## III.  DISCUSSION

Under the ADEA, it is "unlawful for an employer . . . to discharge any individual or otherwise discriminate . . . because of such individual's age." 29 U.S.C. § 623(a)(1). An employee must be over forty years old to be within the protected class defined by the ADEA. 29 U.S.C. § 631(a). An employer's "liability [under the ADEA] depends on whether . . . [age] actually motivated the employer's decision." *Hazen Paper Co. v. Biggins*, 507 U.S. 604, 610 (1993) (citations omitted). When evaluating an ADEA case, the Court does not, however, pass on the wisdom or fairness of an employer's otherwise lawful business decisions—"[n]either the jury nor this Court is empowered to act as a 'super-personnel department' and decide if [an employer's employment decision] was unwise or unjustified." *Castleman v. Acme Boot Co.*, 959 F.2d 1417, 1422 (7th Cir. 1992) (citation omitted); *accord, e.g., Aungst v. Westinghouse Elec. Corp.*, 937 F.2d 1216, 1220 (7th Cir. 1991) (under the ADEA, a company's hiring and firing

12

practices, for better or worse, may be "medieval," "high-handed," or "mistaken" so long as age is not a relevant factor in employment decisions) (citations and internal quotations omitted), *overruled in part on other grounds by Oxman v. WLS-TV*, 12 F.3d 652 (7th Cir. 1993).

A plaintiff may present evidence of discrimination under either the "direct method" or "indirect method." *Cerutti v. BASF Corp.*, 349 F.3d 1055, 1060 (7th Cir. 2003). Under the direct method, a plaintiff must "show, by way of direct or circumstantial evidence, that his employer's decision to take an adverse job action against him was motivated by an impermissible purpose, such as . . . age." *Id.* at 1061. A plaintiff may offer evidence under the indirect method by using the familiar *McDonnell Douglas* burden-shifting formula. *See McDonnell Douglas v. Green*, 411 U.S. 792 (1973). Under either method, the plaintiff must ultimately "demonstrate that the employer would not have made the adverse employment decision in question but for his membership in a protected class." *Cerutti*, 349 F.3d at 1061-62 (collecting cases).

The Seventh Circuit has defined direct evidence in the employment law context as evidence, which if believed by the trier of fact, will prove the particular fact in question without reliance on inference or presumption. *See, e.g., Rogers v. City of Chicago*, 320 F.3d 748, 753 (7th Cir. 2003) (citations omitted). The Seventh Circuit has repeatedly counseled that "[d]irect evidence usually requires an admission by the decisionmaker that his actions were based on age." *Balderson v. Fairbanks Morse Engine Div. of Coltec Indus.*, 328 F.3d 309, 321 (7th Cir. 2003); *see also Cerutti*, 349 F.3d at 1061 ("Direct evidence 'essentially requires an admission by the decision-maker that his actions were based upon the prohibited animus.'") (quoting *Rogers*, 320

F.3d at 753) (alteration omitted).[12]  Regardless of whether direct evidence must *always* take the

form of an outright admission, as opposed to something less, the law is clear that direct evidence

(as the name implies) must speak directly to the issue of discriminatory intent, and, equally

important, it must relate to the specific employment decision in question.  *See, e.g., Cowen v.

Glenbrook Sec. Servs., Inc.*, 123 F.3d 438, 443 (7th Cir. 1997).  A plaintiff using direct evidence

to prove age discrimination must establish that he would not have been discharged but for his

employer's motive to discriminate against him on the basis of age.  *See Mills v. First Fed'l Savs.

& Loan Ass'n of Belvidere*, 83 F.3d 833, 840 (7th Cir. 1996).  If an employer has expressed

discriminatory feelings, the court looks to whether the expression occurred "(1) around the time

of, and (2) in reference to, the adverse employment action complained of."  *Hunt v. City of

Markham*, 219 F.3d 649, 652 (7th Cir. 2000).[13]

---

[12]  The Seventh Circuit has explained that evidence of this sort is exemplified by statements such as "'I fired you because of your age.'"  *See Robin v. Espo Eng'g Corp.*, 200 F.3d 1081, 1088 (7th Cir. 2000); *see also Castleman*, 959 F.2d at 1420 (teaching that direct evidence will "rarely" be found).

[13]  Perhaps recognizing the difficulty of finding explicit direct evidence of the type outlined above, the Seventh Circuit has also held that a plaintiff, under the direct method of proof, may overcome summary judgment by "constructing a convincing mosaic of circumstantial evidence that allows a jury to infer intentional discrimination by the decisionmaker."  *Cerutti*, 349 F.3d at 1061 (citations and internal quotations omitted).  This "mosaic" of circumstantial evidence, however, "must point directly to a discriminatory reason for the employer's action."  *Id.* (citation omitted).  Other Seventh Circuit authority treats an alleged "mosaic of circumstantial evidence" as indirect evidence that is often best analyzed through the classic *McDonnell Douglas* burden-shifting framework.  *See, e.g., Robin*, 200 F.3d at 1090 ("Whether the evidence is characterized as 'indirect' or 'mosaic' evidence, very often the best way to evaluate the plaintiff's case at the summary judgment stage is to use the *McDonnell Douglas* steps. . . .").  The parties in this case have briefed circumstantial evidence issues using the *McDonnell Douglas* framework, and because the parties' approach is consistent with the Seventh Circuit's teaching in *Robin*, the Court will proceed with the analysis as framed by the parties.  *See Robin*, 200 F.3d at 1090; *see also* discussion *infra* Part B.  Whatever approach one might use to analyze the record in this case, the Court believes that summary judgment is appropriate, as explained further below.

## A. Plaintiff's Direct Evidence

Plaintiff provides only one example of what he believes to be direct evidence that Defendant discriminated against him on the basis of age. Plaintiff argues that Balazs made "blatantly ageist remarks contemporaneous with the decision to terminate [Plaintiff]." (Pl. Resp. at 4.) Specifically, Plaintiff alleges that Balazs referred to Saifur Rahman—in the month between the time Rahman started working and Plaintiff was fired (Def. SF Ex. B at 119)—as "the kid," not by his name, Saifur Rahman. (Pl. Resp. Br. at 5; Pl. SAF ¶ 75.) Plaintiff claims that Balazs's alleged statements are "crystal clear direct evidence" of discrimination against Plaintiff. (Pl. Resp. Br. at 5.)

The Court finds that Balazs's alleged reference to Rahman as "the kid" hardly rises to the level of direct evidence of age discrimination against Plaintiff. As a practical matter, it is difficult for a plaintiff to show direct evidence of impermissible motive on the part of an employer and such comments are "rarely found." *Radue*, 219 F.3d at 616 (7th Cir. 2000); *accord, e.g., Castleman*, 958 F.2d at 1420. The evidence must essentially be an admission that Plaintiff's firing was motivated by animus toward his age (forty-three). *See Radue*, 219 F.3d at 616. Equally important, for Balazs's remarks to "qualify as direct evidence of discrimination, Plaintiff must show that the remarks were related to the employment decision in question." *Robin*, 200 F.2d at 1089 (internal quotation and citation omitted).

Balazs's alleged use of the term "the kid" for Rahman does not suffice under Seventh Circuit precedent—both because it is not evidence of the clarity required to constitute direct evidence of discrimination, and also, independently, because such alleged statements are not sufficiently related to Plaintiff's termination. At most, Balazs's use of "the kid" appears to be

what caselaw deems a "stray remark." If anything, a more reasonable inference might be that Balazs—himself age 43 at the time (Def. SF ¶ 4)—was making a negative comment regarding *Rahman's* age, not Plaintiff's. Or perhaps the alleged comments (assuming they occurred, as that is disputed) were prompted by Balazs's unfamiliarity with Saifur Rahman, at least during the initial period that Rahman started working with Balazs, or with possible difficulty confidently pronouncing Saifur Rahman's name in these early days. In any event, it is clear that a jury could not, "without reliance on inference or assumption," conclude that Balazs's alleged statements prove that Allstate discriminated against Plaintiff on the basis of age. *Plair* v. *E.J. Brach & Sons, Inc.*, 105 F.3d 343, 347 (7th Cir. 1997). And there is no evidence to suggest that the stray remark was related to Plaintiff or his termination. *See Gorence v. Eagle Food Centers, Inc.*, 242 F.3d 759, 762 (7th Cir. 2001) ("'[A] 'stray' remark[] [is] a remark which fails to show discrimination unless it is related to the employment decision."); *Hong v. Children's Memorial Hosp.*, 993 F.2d 1257, 1266 (7th Cir. 1993).

A review of Seventh Circuit precedent confirms that the alleged use of "the kid" to refer to Rahman does not constitute any direct evidence of age discrimination against Plaintiff. *See, e.g., Cerutti*, 349 F.3d at 1063 (even if plaintiff was the subject of questions such as "'How's the old man doing today?'" such statements were "clearly not sufficient to establish . . . age discrimination under the direct method of proof"); *Gorence*, 242 F.3d at 766 (holding that even if defendant's officer referred to promoted managers as "young" and "aggressive," that did not constitute direct evidence of age discrimination against passed-over plaintiff and was not evidence "connect[ed] to a decision regarding [plaintiff]"); *Fuka v. Thompson Consumer Elecs.*, 82 F.3d 1397, 1403 (7th Cir. 1996) (no direct evidence of age-motivated firing from supervisor's

16

statements that he preferred to hire "young people fresh out of college" and that he wanted to "pass" on an applicant whose resume indicated that the applicant had "to be at least 50" because such comments were not linked to plaintiff's termination); *see also Jones v. Union Pac. R.R. Co.*, 302 F.3d 735, 743 (7th Cir. 2002) (defendant's description of plaintiff as a "black male" in company report concerning incident that allegedly was the cause of plaintiff's firing was not "evidence of discriminatory intent"); *Plair*, 105 F.3d at 348 (same). In short, the alleged statements about "the kid" are insufficient to forestall summary judgment.

### B. Plaintiff's Indirect Evidence

In evaluating Plaintiff's alleged indirect evidence of discrimination, the Court applies the familiar *McDonnell Douglas* burden-shifting analysis. The *McDonnell Douglas* method of proof entails three steps. *See Robin*, 200 F.3d at 1088, 1090. A plaintiff must first establish a prima facie case of employment discrimination. *See id.* at 1088. If the plaintiff successfully presents a prima facie case, a presumption of discrimination arises and the burden shifts to the defendant to offer evidence of a legitimate, nondiscriminatory reason for taking the adverse employment action. *See id.* The plaintiff "must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Baron v. City of Highland Park*, 195 F.3d 333, 339 (7th Cir. 1999) (internal quotation and citation omitted).

To establish a prima facie ADEA case, a plaintiff must demonstrate that: (1) he is in the protected class of age forty or older; (2) he was performing his job to the employer's legitimate expectations; (3) he was subject to an adverse employment action; and (4) similarly situated and substantially younger employees were treated more favorably. *See Franzoni v. Hartmarx Corp.*,

300 F.3d 767, 771-72 (7th Cir. 2002); *Michas v. Health Cost Controls of Ill., Inc.*, 209 F.3d 687, 693 (7th Cir. 2000). If the plaintiff establishes a prima facie case, the burden shifts to the defendant to articulate a legitimate, non-discriminatory reason for the adverse employment action. *See Taylor v. Canteen Corp.*, 69 F.3d 773, 780 (7th Cir. 1995). If the defendant meets its burden, the burden shifts back to the plaintiff to prove that the defendant's articulated reason is merely pretextual—in other words, "that a discriminatory reason more likely motivated [the defendant] or that the proffered explanation is unworthy of credence." *Rand v. CF Indus., Inc.*, 42 F.3d 1139, 1145 (7th Cir. 1994) (citation omitted); *see also Kulumani v. Blue Cross Blue Shield Ass'n*, 224 F.3d 681, 685 (7th Cir. 2000) ("[Pretext] means a dishonest explanation, a lie rather than an oddity or an error.").

Defendant does not dispute that Plaintiff satisfies the first three requirements of a prima facie case. (Defendant does dispute the pretext prong of the *McDonnell Douglas* analysis, but more on that later.) Accordingly, the first question before the Court is whether Plaintiff satisfies the fourth element of a prima facie case. At the outset, the Court notes that the Seventh Circuit has articulated different standards for evaluation of the fourth element in employment cases, recognizing "the variety of adverse employment actions covered within the broad reach of the discrimination statutes. . . ." *Michas*, 209 F.3d at 693. The Seventh Circuit has likewise set forth various articulations of the fourth prima facie element in ADEA discharge cases—consistent with the Seventh Circuit's teaching that the *McDonnell Douglas* framework must be applied flexibly and tailored to the particular circumstances of the case at hand. *See Gadsby v. Norwalk Furniture Corp.*, 71 F.3d 1324, 1331-32 & n.3 (7th Cir. 1995) (collecting cases).

Plaintiff urges that we adopt what he sees as the fourth element analysis adopted in

*Gadsby.* Specifically, Plaintiff cites *Gadsby* for the proposition that "[a]n age discrimination plaintiff merely needs to show that a younger employee assumed or absorbed the duties and responsibilities of the plaintiff." (Pl. Resp. Br. at 7 (citing *Gadsby*, 71 F.3d at 1331-33).) Plaintiff also cites *Gadsby* for the proposition that "the inference of discrimination [in such cases] is premised on some degree of fungibility between the [terminated employee's] job and the younger employee's job[,] and in such "fungibility . . . situation[s], all the employee needs to establish is that he was treated less favorably than one or more similarly situated younger employees." (*Id.*) Thus, Plaintiff argues, "an employer who discharges a protected employee and either hires or retains younger employees to fill positions for which the older employee was qualified bears the burden of explaining its actions." (*Id.*)

The Court respectfully suggests that Plaintiff's reliance on *Gadsby* is misplaced. Plaintiff omits from his *Gadsby* quotations pertinent language showing that the proffered analysis applies to reduction-in-force ("RIF") cases, not to single-discharge cases based on misconduct, as is the case here. *See Gadsby*, 71 F.3d at 1331 ("*In an RIF case*, the inference of discrimination . . . is premised on some degree of fungibility. . . .") (emphasis added). RIF cases are distinct from insubordination cases such as this one because in RIF cases "an employer, in the course of restructuring the business, terminates several (or numerous) employees and does not *replace* them with new employees." *Miller v. Borden, Inc.*, 168 F.3d 308, 313 n.1 (7th Cir. 1999) (emphasis in original). In RIF cases, any "inference of discrimination comes from the belief that the employer selected the plaintiff for termination based on age from a group of employees who were *equally qualified* for termination based on criteria other than age." *Gadsby*, 71 F.3d at 1331 (emphasis added). In cases involving fungibility, all the employee needs to establish is that he

19

was treated less favorably than one or more similarly situated employees. *See Miller*, 168 F.3d at 313. In RIF cases, the Seventh Circuit typically does "not require a plaintiff to prove that he has been replaced by a younger employee." *Gadsby*, 71 F.3d at 1331 (citations omitted).

The case at bar is not an RIF case; instead, both parties agree that plaintiff was terminated for misconduct (or at least alleged misconduct) for failing to provide the password for the "Move, Add, Change" program. (Def. SF ¶ 46; Pl. Resp. ¶ 46.[14]) Thus, under the facts of this case, it is most appropriate to evaluate the fourth element of Plaintiff's prima facie case using the analysis from employee disciplinary cases.

In an ADEA disciplinary case, a plaintiff must show that he was disciplined more harshly than similarly situated younger employees because of the employer's ageist animus. *See, e.g.*, *Radue*, 219 F.3d at 617. To satisfy the "similarly situated" element, the plaintiff in a disciplinary case must show that he is similarly situated to the younger comparators "with respect to performance, qualifications, and *conduct*." *Id.* (emphasis added) (citing *Byrd v. Ronayne*, 61 F.3d 1026, 1032 (1st Cir. 1995)). Under this analysis, Plaintiff fails to make a prima facie case because, even assuming he can point to comparators with similar performance and qualifications, Plaintiff has provided no evidence that any younger employee committed the same or similar misconduct but were nonetheless retained in their job. (*See, e.g.*, Def. SF Ex. B at 108, 114.) The Seventh Circuit requires such evidence in this type of discrimination case, and Plaintiff's failure to produce it is fatal to his case. *See, e.g.*, *Jones*, 302 F.3d at 745 (holding that plaintiff "failed to establish part four of the prima facie case" because he failed to provide an example of

---

[14] As discussed elsewhere in the opinion, Plaintiff's sworn testimony before the IDES in 2001 confirms that the most appropriate method, on the facts of this case, for analyzing the fourth prong is the disciplinary discharge/employee insubordination analysis.

another employee being "treated more favorably under similar circumstances" after plaintiff engaged in insubordination); *Plair*, 105 F.3d at 349-350 & n.3 (same).

Moreover, even if the Court instead accepts and applies Plaintiff's interpretation of *Gadsby*, Plaintiff nonetheless would fall short of making a prima facie case. In this vein, the Court notes that Plaintiff actually urges the Court to adopt two different formulations of the fourth prong, each more permissive than the formulation in misconduct/termination cases. The first is the RIF "fungibility" analysis, in which a plaintiff must show that he was treated less favorably than one or more similarly situated or equally qualified younger employees who were retained. *See, e.g., Miller*, 168 F.3d at 313; *Gadsby*, 71 F.3d at 1331. The second formulation is the Seventh Circuit's so-called "mini-RIF fungibility" analysis, in which a plaintiff must show that his duties were absorbed by other employees not in the protected class. *See Bellaver v. Quanex*, 200 F.3d 485, 495 (7th Cir. 2000). Under this analysis, Plaintiff need not show that the younger employees are similarly situated. *See id.* Plaintiff fails to make a prima facie case under either of the proffered formulations.

## 1. The "RIF" Formulation

Plaintiff provides evidence of what he believes to be more favorable treatment of similarly situated young employees. The gist of Plaintiff's argument is that Allstate maintained a "double standard" between older and younger employees and that Plaintiff's younger counterparts were not subjected to discriminatory treatment. (Compl. ¶ 13.) Specifically, Plaintiff offers the following evidence that Defendant discriminated against him. First, Plaintiff asserts that younger employees took over some of his job responsibilities following his termination. For example, Plaintiff asserts that Saifur Rahman (age 26) handled "Move, Add,

Change," worked on the VSSL, and maintained forms that Plaintiff developed. (Pl. SAF ¶¶ 78-79.) Another younger employee, Kahwon Taylor (age 25), later took over responsibilities for the VSSL. (Pl. SAF ¶ 83.) Plaintiff also points to Shaohui Xia, whom Allstate hired to fill the vacancy created by Plaintiff's termination. (Pl. Resp. Br. at 8; Def. SF ¶ 54.) Shaoui was 37 years old at the time of her hire. (Def. SF ¶ 55.)

Second, Plaintiff claims that Defendant treated younger workers preferentially. Plaintiff alleges that he had repeatedly asked Balazs for new software and hardware, including a laptop. (Pl. SAF ¶¶ 84, 86.)[15] Plaintiff argues that his younger colleagues received these benefits. For example, Plaintiff claims that Allstate gave Rahman a brand new laptop and the latest software when he started work. (Pl. SAF ¶ 80.) Plaintiff also alleges that Steve Wright (age 25), one of Plaintiff's coworkers, "had all the latest software," whereas Plaintiff had older software. (*Id.* ¶ 84.) Moreover, Plaintiff argues, Allstate afforded Rahman the benefit of "Method One methodology"[16] for problem solving, while Allstate withheld such support from Plaintiff while he was doing the installation work for the MAI team. (*Id.* ¶ 81.)

Plaintiff also asserts that CTS never assigned an employee advocate to work with him on

---

[15] Plaintiff asserts that he requested a laptop from Balazs (Pl. SAF ¶ 86), but also (paradoxically) admits that he did no such thing. (Def. SF ¶ 69; Pl. Resp. ¶ 69.) An examination of Plaintiff's deposition testimony further reveals what seem to be contradictory positions with respect to whether Plaintiff requested a laptop. (Def. SF Ex. B at 111, 124.) As it makes no difference in the end, the Court will assume that Plaintiff requested a laptop from Balazs.

[16] Method One apparently is a vended product used in CTS. "Methodology" appears simply to be a way of managing a project—"It's the process of initiating a project, gathering requirements, documenting those requirements, doing analysis and design, construction, and ultimately delivery of the application." (Def. SF Ex. G at 101.) In brief, methodologies are problem solving techniques for application development, and Method One is a particular methodology.

the MAI project, even though employees who worked outside of CTS would typically be assigned one. (*Id.* ¶ 82.) Plaintiff also believed that Balazs and Noe were "doing everything they could to help . . . [Rahman even though] [t]hey weren't doing anything to help me while I was struggling at MAI." (Def. SF ¶ 56.) According to Plaintiff, these disparities negatively impacted his performance because the older software, and lack of Method One methodologies, caused him to take longer to perform his duties. (Pl. SAF ¶ 85.)

Finally, Plaintiff also claims that Jessica Wright[17] ("Ms. Wright") (age 25),[18] from the expense department, received preferential treatment. In particular, Plaintiff asserts that Ms. Wright had difficulty timely completing a large spreadsheet reconciliation project. (Def. SF Ex. B at 112-13.) Plaintiff's argument, it seems, is that Allstate took no adverse action against Ms. Wright, even though she was about six months behind in her project. (*Id.* at 113.)

Under the RIF formulation of the fourth prong, to establish a prima facie case, Plaintiff must show that the younger employees were similarly situated to him. To do this, Plaintiff must

---

[17] Plaintiff in his brief points to Jessica Wright as another younger comparator. (Pl. Resp. Br. at 8.) He cites to no facts regarding the relevance of Ms. Wright. Indeed, the only facts regarding Ms. Wright in either party's statement of facts is in Defendant's statement (Def. SF ¶ 61.), which are supported by citation to Plaintiff's deposition testimony. (Def. SF Ex. B at 112-113.) Plaintiff cites to none of this to support the conclusory arguments in his summary judgment brief. (Pl. Resp. at 8.) The Seventh Circuit has repeatedly instructed that "a party contesting summary judgment has a responsibility under [Local Rule 56.1] to highlight which factual averments are in conflict as well as what record evidence there is to confirm the dispute." *Little v. Cox's Supermarkets*, 71 F.3d 637, 641 (7th Cir. 1995) (internal quotation marks omitted); *see also id.* ("It is reasonable to assume that just as a district court is not required to scour the record looking for factual disputes, . . . it is not required to scour the party's various submissions to piece together appropriate arguments.") (citations and internal quotation marks omitted). As it makes no difference in the end, the Court chooses not to ignore Plaintiff's unsupported allegations concerning Ms. Wright.

[18] It is unclear from the record how old Jessica Wright was at the time relevant to this case. The Court will assume that Plaintiff's estimate of 25 is accurate. (Vonckx Tr. at 113-14.)

show "at a minimum that the [comparators] possessed analogous attributes, experience, education, and qualifications relevant to [Plaintiff's position], and that the [comparators] obtained the desired position around the same time as the [termination]." *Radue*, 219 F.3d at 618 (collecting cases). Plaintiff "need not show complete identity in comparing himself to the better treated employee[s], but he must show substantial similarity." *Id.* (citation omitted). In addition, a plaintiff typically should provide evidence of a common supervisor or decisionmaker to show substantial similarity. *See, e.g., id.* at 617-18.

Applying these standards, the Court finds that plaintiff's evidence falls short. None of the various comparators plaintiff names is "similarly situated" as defined in the relevant caselaw.

Plaintiff alleges no specific facts showing that Rahman, for example, "possessed analogous attributes, experience, education, and qualifications" such that he may be similarly situated to Plaintiff. *See Radue*, 219 F.3d at 618. If anything, Plaintiff's expertise and level of experience appear to set him far apart from Rahman. Plaintiff's professional experience began "in 1980 or 1981." (Pl. SAF ¶ 1.) By the time Plaintiff started contract work for Allstate in 1994, he had accumulated over a dozen years of technical experience in the field. (*See id.* ¶¶ 1-7.) As of his termination, Plaintiff was somewhat of a computing "go-to guy." (*Id.* ¶ 14.) Plaintiff's duties in CTS included maintaining the VSSL, the problem solving system, maintaining forms, and granting permissions for systems or file directories. (Def. SF ¶ 47.) Plaintiff did no web development work. (*Id.* ¶ 49.)

Rahman, on the other hand, was hired as a web developer. (Def. SF ¶ 49.) During the three weeks before Plaintiff's termination, Rahman, a brand new hire, was participating in Allstate's orientation program. (Def. SF Ex. B at 97.) Plaintiff alleges no facts, nor has the

24

Court found anything in the record, to indicate that Rahman is analogous to Plaintiff in terms of attributes, experience, education, or qualifications. *See Radue*, 219 F.3d at 618. Thus, Plaintiff cannot reasonably claim Rahman as a similarly situated comparator. It is therefore not relevant whether, as Plaintiff alleges, Rahman received new equipment and software, or the benefits of Method One.[19] It is also irrelevant that Balazs and Noe, as Plaintiff claims, did "everything they could to help their new hire [Rahman]." (Def. SF ¶ 56.) There is nothing unusual or unlawful about Balazs or Noe helping a new hire to the extent they could, and Plaintiff cites no evidence of discrimination beyond his conclusory assertion that they did nothing for him while he "was struggling at MAI." (*Id.*)

Likewise, Plaintiff cannot reasonably contend that Steve Wright ("Wright") was similarly situated.[20] Plaintiff cites to nothing with which one could reasonably find that Wright possessed analogous attributes, experience, education, or qualifications to Plaintiff. *See Radue*, 219 F.3d at 618. Plaintiff points to no evidence, for example, that Wright performed the same sort of work that Plaintiff did or that Wright had any other similarity to Plaintiff.[21] True, Wright was assigned

---

[19] Balazs at his deposition explained that Plaintiff did not have Method One because Plaintiff's work for the MAI team was considered a task, not a project. (Def. SF Ex. G at 89.) Method One, as explained in footnote 16 *supra*, is a development methodology that CTS used for projects, not merely for work assignments like Plaintiff's. (Def. SF Ex. G at 89.)

[20] As he did with Jessica Wright, *see* footnote 17 *supra*, Plaintiff makes the conclusory argument that Steve Wright is a younger comparator, but cites neither party's statement of facts or anything in the record. (Pl. Resp. Br. at 8.)

[21] Other than Plaintiff's conclusory assertion that Steve Wright "had all of the latest software," (Pl. SAF ¶ 84), the only other statements of fact regarding Wright come from Allstate's statement of facts. (Def. SF ¶¶ 28-29, 59-60.) The Court need not scour the record in search of facts in support of Plaintiff's efforts to defeat summary judgment, *see Little*, 71 F.3d at 641, especially when Plaintiff failed to present such facts as L.R. 56.1 requires.

to CTS, but the similarities end there. Unlike Plaintiff, Wright was not assigned to the TAS team.[22] (Def. SF ¶ 28.) Balazs was not Wright's supervisor. (*Id.* ¶ 60.) Wright was not working on "Move, Add, Change." (*Id.* ¶ 28.) As a result, because Wright is not a meaningful comparator, Plaintiff may not claim that Wright is similarly situated for purposes of his prima facie case. This is especially true when Plaintiff and Wright did not even share the same supervisor. *See Radue*, 219 F.3d at 618 ("Different employment decisions, concerning different employees, made by different supervisors, are seldom sufficiently comparable to establish a prima facie case of discrimination. . . .") Thus, it is irrelevant that Allstate may have equipped Wright with a laptop computer and newer software while Plaintiff had not received these computer resources by the time he was fired.

Plaintiff's attempt to label Jessica Wright a younger comparator similarly fails. It is undisputed that Ms. Wright was not on the TAS team, nor was Balazs her supervisor. (Def. SF ¶ 62.) Moreover, Ms. Wright, by Plaintiff's own admission, "was not real [sic] experienced" and "worked in the expense department." (Def. SF Ex. B at 112-13.) Neither attribute compares well to Plaintiff, a highly experienced computer programmer assigned to TAS. Moreover, Plaintiff points to nothing else in either party's statement of facts by which one could say that Ms. Wright possessed analogous attributes, experience, education, or qualifications to Plaintiff.[23]

---

[22] For the reasons set forth in footnote 4 *supra*, Plaintiff's denial of Defendant's ¶ 28 is improper, and the facts alleged therein are deemed admitted.

[23] The Court notes that Plaintiff in his deposition also mentions Lydia Rosado as a comparator. (Def. SF Ex. B at 114-15.) However, in his summary judgment brief, Plaintiff omits any mention or explanation of Rosado as a comparator. Likewise, Plaintiff's L.R. 56.1 statement of fact also omits any factual assertion that Allstate treated Rosado preferentially or that Rosado in any way qualifies as a similarly situated comparator for purposes of Plaintiff's ADEA claim. (*See* Pl. SAF ¶¶ 74-86.) Even if Plaintiff had attempted such explanation, the

Likewise, Plaintiff's complaint that he was never assigned an "employee advocate" for the MAI job does not, by itself, constitute evidence of preferential treatment for any of the purported younger comparators. Plaintiff cites no evidence that younger CTS employees working outside of CTS on similar assignment received employee advocates.

Finally, although not necessary to the rejection of Plaintiff's prima facie case, it bears mention that none of the allegedly similarly situated comparators engaged in workplace misconduct of the sort that Plaintiff did. Up until the time that Plaintiff engaged in the password stonewalling, he was highly rated at Allstate: Allstate was pleased with him and he appears to have been pleased with Allstate. In fact, after Plaintiff's last performance review, just months before the password incident that prompted his firing, Plaintiff stated his appreciation to his entire Allstate management team for their support and for "giving [him] an opportunity to move up and branch out from [his] previous job responsibilities." (Def. SF ¶ 11.) Whether Plaintiff had a particular type of software or not, as compared to a colleague or new hire, for example, is not relevant when the other individuals never engaged in the type of employee misconduct that Plaintiff did immediately prior to his firing. *See, e.g., Radue*, 219 F.3d at 618-19.

### 2. Plaintiff's "Mini-RIF" Formulation

Plaintiff also argues that younger employees assumed his duties following his termination and that this fact carries the day with respect to making a prima facie showing. In effect, Plaintiff argues that the Seventh Circuit's "mini-RIF" standard should apply, wherein a plaintiff may satisfy the fourth prong with evidence that sufficiently younger employees absorbed his duties or

Court has found nothing in the record to indicate that Allstate treated Rosado preferentially or that she otherwise qualifies as a younger comparator for Plaintiff's purposes.

"constructively replaced" Plaintiff following his termination. *See Bellaver*, 200 F.3d at 494-495 (citation omitted).

In his brief, Plaintiff argues (without citation to any authority), that "[t]he only dispositive issue is whether younger employees assumed <u>any</u> of Plaintiff's job duties. They did, and the Court need not inquire further." (Pl. Resp. Br. at 8 n.2.) (emphasis in original). The Court respectfully disagrees. Caselaw indicates that Plaintiff must do more than merely show that younger employees absorbed *any* of his duties. Instead, it appears that Plaintiff must show that his duties, at the least, were absorbed *mostly* by younger employees. *See, e.g., Bellaver*, 200 F.3d at 495 (citing Seventh Circuit caselaw in which plaintiff showed that duties "were absorbed *mostly* by younger workers") (emphasis added and citation omitted); *Kazhinsky v. Meyer & Sons, Inc.*, No. 02-C-7254, 2003 WL 22735867, at *5 (N.D. Ill. Nov. 19, 2003) (collecting cases and holding that, "[b]ecause half of the individuals who assumed [the ADEA plaintiff's] job duties were in the protected class [*i.e.*, of a protected age], she cannot show that her duties were assumed solely or even primarily by employees outside the protected class"). Under this standard, Plaintiff cannot make a prima facie case under the mini-RIF formulation, either.

In this regard, Plaintiff provides evidence that younger workers outside the protected class absorbed some small amount of his duties. For example, Plaintiff claims that, after his termination, Rahman took on Plaintiff's duties with respect to the VSSL and maintained the forms that plaintiff developed. (Pl. SAF ¶ 78.) Plaintiff also alleges that Rahman took on his "Move, Add, Change" responsibilities. (*Id.* ¶ 79.) Finally, Plaintiff asserts that Kawhon Taylor ("Taylor") (age 25) eventually took over his VSSL responsibilities. (*Id.* ¶ 83.)

Closer scrutiny of the record reveals that these assertions are not sufficient to make

Plaintiff's prima facie case. While Rahman maintained the "Move, Add, Change" system that Plaintiff had developed, and took on team share administration duties that Plaintiff once performed, Plaintiff acknowledges that these duties only occupied about five percent of Rahman's time. (Def. SF ¶ 53.) Rahman worked on VSSL only in transition before the work could be reassigned to Taylor. (Def. SF Ex. G at 102-03.) Plaintiff's VSSL duties then passed on to Taylor, who worked in a different department and thus did not answer to Balazs. (Def. SF ¶ 52.)

As for his remaining job responsibilities, Plaintiff does not dispute that Allstate transferred much of them to other teams. (Pl. Resp. SF ¶ 50.) For example, Plaintiff's work on "environmental setup manager" was transferred to another department in CTS and assigned to Robert Hay ("Hay") (age 50) and Maimon Lusky ("Lusky") (age 51). In total, therefore, Plaintiff's duties were absorbed by four Allstate employees, and two of them who absorbed the bulk of the work (Hay and Lusky) are older than Plaintiff.[24] (Def. SF ¶¶ 50-53; Pl. Resp. ¶¶ 50-53.) Rahman temporarily absorbed Plaintiff's duties that remained in TAS, and, as mentioned above, it is undisputed that Rahman spent only five percent of his time on these duties. (*See* Pl. Resp. ¶ 53.)

Finally, the Court notes that Plaintiff mentions Shaohui Xia, whom Allstate concedes it

---

[24] Allstate indicated in response to Plaintiff's interrogatories that Plaintiff's job duties were assigned to Rahman, Taylor, Hay, Lusky, and Shaohui Xia. (Def. SF Ex. G, Tab 8, ¶ 8.) Ms. Xia is listed as having assumed Plaintiff's web development duties. (*Id.*) This appears to be in error; Plaintiff has admitted that he had no web development duties. (Pl. Resp. ¶ 49.) Moreover, Balazs and Noe explained that Xia replaced Plaintiff as far as headcount in TAS, not in web development, which Plaintiff admittedly did not do. (Def. SF Ex. G at 120; Noe Tr. ("Def. SF Ex. F") at 54.) In light of Plaintiff's admission and Defendant's explanations, the Court finds that there is no factual dispute that Plaintiff had no web development duties.

hired to fill the numerical vacancy created by Plaintiff's termination (although Ms. Xia did not

assume Plaintiff's job responsibilities). Under the RIF analysis Plaintiff seeks, he need not show

that he has been *replaced by* a younger employee after his termination. *See Gadsby*, 71 F.3d at

1331 (citation omitted). The Court will nonetheless evaluate Shaohui Xia's hire because

Plaintiff mentions it in his summary judgment brief. (*See* Pl. Resp. Br. at 8.)

It is undisputed that Allstate hired Ms. Xia to fill the numerical vacancy created by

Plaintiff's termination. (Def. SF ¶ 54.) Ms. Xia's duties, however, involved web development,

not any of Plaintiff's previous duties (Def. SF Ex. G at 120), and Plaintiff provides no evidence

to the contrary. But even if Allstate did hire Xia to take over Plaintiff's job, Plaintiff still cannot

make a prima facie case.

The problem, from Plaintiff's standpoint, is that Ms. Xia was age 37 at the time Allstate

hired her. True, Ms. Xia was younger than Plaintiff and not within the protected class, but

caselaw requires Plaintiff to produce *substantially* younger coworkers who assumed his tasks, not

merely younger ones. To be substantially younger, a coworker normally must be at least ten

years younger than the plaintiff. *See, e.g., Radue*, 219 F.3d at 619 (holding that employees who

were, respectively, seven and nine and one-half years younger than plaintiff were not

"substantially younger"); *Hartley v. Wisconsin Bell, Inc.*, 124 F.3d 887, 893 (7th Cir. 1997)

(noting that a seven-year age difference is presumptively insubstantial, and stating that "[t]en

years is a reasonable threshold establishing a 'significant' and 'substantial' gap"). Ms. Xia, at

age 37, was only six years younger than Plaintiff, so she was not substantially younger as

required.

Plaintiff challenges this presumptively insubstantial age gap by citation to *Richter v.*

*Hook-SupeRX, Inc.*, 142 F.3d 1024, 1029 (7th Cir. 1998) ("[I]n cases where the disparity is less [than ten years], the plaintiff may still be able to present a triable claim if he directs the court to evidence that his employer considered his age to be significant.") (citation omitted). Plaintiff omits language qualifying the Seventh Circuit's teaching that the ten-year gap is not always a bright line rule. In *Richter*, the Seventh Circuit clarified that an age disparity smaller than ten years might support an age discrimination claim if supported by convincing additional evidence that would likely include direct evidence (thus making the indirect evidence method less relevant). *See id.* at 1029 n.3 (citing *Hartley*, 124 F.3d at 893). This would include evidence that the employer considered plaintiff's age to be significant. *See Hartley*, 124 F.3d at 893. The only possible evidence that Plaintiff offers on this score is Balazs's reference to Saifur Rahman as "the kid." As the Court already noted, "the kid" does not qualify as direct evidence of discrimination—and it does not qualify as evidence that Balazs considered *Plaintiff's* (as opposed to, perhaps, Rahman's) age to be significant at all. *See Richter*, 142 F.3d at 1032 (indicating that if decision-maker was member of age-protected class, that militates against any inference of age discrimination). Plaintiff provides no evidence that Balazs or any other Allstate employee involved in his termination considered Plaintiff's age to be significant.

In sum, the Court believes that the facts of this case best fit the disciplinary dicharge model, and the prima facie analysis should proceed along those lines, under which Plaintiff's case fails and summary judgment is appropriate. Even if another prima facie analytical method is employed, the Court still believes that Plaintiff's case fails and summary judgment is warranted.

### C. Pretext Analysis

Even if Plaintiff could make out a prima facie case under the fourth prong, summary

judgment would be justified for the alternative and independent reason that Plaintiff cannot on this record put at issue that Allstate's articulated reason for terminating Plaintiff was actually a pretext for age discrimination.

To show pretext, Plaintiff must specifically rebut Allstate's proffered reason by demonstrating that it is not true. *See Kulumani*, 224 F.3d at 685; *Kariotis v. Navistar Int'l Trans. Corp.*, 131 F.3d 672, 676 (7th Cir. 1997). It is insufficient for Plaintiff merely "to show that . . . [Allstate] acted incorrectly or undesirably by firing him; . . . [Plaintiff] must show that . . . [Allstate] did not honestly believe in the reasons it gave for firing him." *Adreani v. First Colonial Bankshares Corp.*, 154 F.3d 389, 395 (7th Cir. 1998) (internal quotation marks and citation omitted). If Allstate honestly believed its articulated reason for terminating Plaintiff, he loses even if the reason is foolish, trivial, or wrong. *See Kariotis*, 131 F.3d at 676-77. The Court will consider Allstate's proffered reason along with Plaintiff's requirement of showing that Allstate's reason is merely a pretext.

Allstate asserts that Plaintiff was terminated for not providing the password for the "Move, Add, Change" program despite repeated requests that he do so. (Def. SF ¶ 46.) Allstate's reason for terminating Plaintiff, on its face, appears perfectly valid and nondiscriminatory, and, more important, Seventh Circuit precedent recognizes as much. *See, e.g., Jones*, 302 F.3d at 742 (stating that "[i]nsubordination is a legitimate, non-discriminatory reason for firing an employee" and collecting numerous Seventh Circuit precedents to same effect) (citation and internal quotation marks omitted). Indeed, Allstate points to ample support in the record to support its proffered reason for firing Plaintiff. Balazs, Noe, Rosado, and Paul Zielinski ("Zielinski") (one of Plaintiff's former coworkers) all gave sworn deposition testimony

that Plaintiff had password-protected the "Move, Add, Change" source code and did not remove

the password for MAI. (*See* Def. SF Ex. G at 79; Def. SF Ex. F at 34; Rosado Tr. ("Def. SF Ex.

E") at 17-18; Zielinski Tr. ("Def. Resp. Ex.") at 11-13.) Plaintiff then refused to divulge this

password to MAI or his superiors, despite repeated requests that he do so. (Def. SF ¶ 46.)

Allstate considered Plaintiff's repeated refusals to be misconduct[25] and terminated him on that

basis. (Def. SF ¶ 36.) Because Allstate's articulated reason for terminating Plaintiff appears

facially valid and nondiscriminatory, Plaintiff must show that Allstate's reason is pretextual. *See*

*Kariotis*, 131 F.3d at 676.

In response, Plaintiff argues that the password issue is merely a pretext for its age

discrimination and that "Defendant's spurious reasons for Plaintiff's termination must be

summarily rejected." (Pl. Resp. Br. at 9.) To successfully challenge Allstate's articulated reason

and thereby establish pretext, Plaintiff must specifically rebut it. *See Kariotis*, 131 F.3d at 677

(collecting cases). A plaintiff's rebuttal, however, "is not an invitation to criticize the employer's

evaluation process or simply to question its conclusion about the quality of an employee's

performance." *Id.* Instead, a plaintiff's "rebuttal must include facts tending to show that the

employer's reasons for some negative job action are false, thereby implying (if not actually

showing) that the real reason is illegal discrimination." *Id.*

Plaintiff offers three reasons why he believes Allstate's stated reason is pretextual. The

Court concludes that none of Plaintiff's arguments—or the facts cited in support—individually or

---

[25] Plaintiff denies the allegations in Defendant's ¶ 36 as "conclusory, argumentative, [and] speculative[,]" without citing to relevant facts in the record, and objects to the paragraph's form. (Pl. Resp. ¶ 36.) For the reasons set forth in footnotes 4 and 9 *supra*, Plaintiff's denial is improper, and the allegations in Defendant's ¶ 36 are deemed admitted.

collectively indicate that Allstate's articulated reason for terminating Plaintiff was merely a pretext for age discrimination.

Plaintiff first offers Balazs's "blatantly ageist statements about Rahman" as evidence "clearly support[ing] a discriminatory motive." (Pl. Resp. Br. at 9 (capitalization omitted).) Plaintiff argues that Balazs's comment is "competent evidence" to rebut Allstate's articulated reason. (*Id.* at 9-10.) The Court disagrees. Plaintiff's resurrection of "the kid" comment does not "specifically rebut" Allstate's reason for terminating Plaintiff. *See Kariotis*, 131 F.3d at 677. Plaintiff presents no evidence that the comment tends to show that Allstate's stated reason is false, and it is at most a stray comment that does not constitute evidence by which a reasonable jury could infer age discrimination. Certainly, the comment does not adequately rebut Allstate's articulated reason for terminating Plaintiff. *See Jones*, 302 F.3d at 743 (company's description of plaintiff as "black male" in investigative reports not evidence of racial animus); *Plair*, 105 F.3d at 348 (same).

Plaintiff's remaining two rebuttal arguments, at least, relate more specifically to Allstate's articulated reason. Plaintiff's arguments boil down to an assertion that Allstate is simply wrong that he withheld any password (because there was no password at all remaining on the software installed at MAI), and therefore: (1) the fact that Allstate failed to properly investigate the password dispute is evidence that Allstate's articulated reason is pretextual, and (2) Allstate's "conversion" of the job performance issue into a loss-of-confidence issue is also evidence of pretext. (*See* Pl. Resp. Br. at 10-12.)

The Court first considers Plaintiff's assertions regarding the nonexistence of a password. The Court notes that Plaintiff's deposition and affidavit testimony about the password contradict

the deposition testimony of Balazs, Noe, Rosado, and Zielinski. In particular, Plaintiff claims

that the "Move, Add, Change" program was not password-protected when he gave the program

to the MAI team, and thus the MAI team had everything it needed to access the source code. (Pl.

SAF ¶¶ 35, 43-45.) Indeed, Plaintiff claims that he was not even aware of any password that

MAI might have needed in order to run his program. (*Id.* ¶ 42.) The Court would normally

resolve such "he said, she said" discrepancies in the nonmovant's (Plaintiff's) favor. *See Foley*,

359 F.3d at 928. This is a different case, however, because Plaintiff told a materially

contradictory story regarding the password issue in the sworn testimony he gave at the August

30, 2001, IDES hearing prior to the testimony he provided in his deposition and affidavit.

It is a long-established rule in the Seventh Circuit that a party "cannot create a genuine

issue of fact by submitting an affidavit containing conclusory allegations which contradict plain

admissions in prior deposition or otherwise sworn testimony." *Diliberti*, 817 F.2d at 1263

(collecting authority from the Seventh and other Circuits). Any contrary rule would allow a party

to "thwart the purposes of Rule 56 by creating 'sham' issues of fact[,]" and "the very purpose of

the summary judgment motion—to weed out unfounded claims, specious denials, and sham

defenses—would be severely undercut." *Bank of Illinois v. Allied Signal Safety Restraint Sys.*, 75

F.3d 1162, 1168-69 (7th Cir. 1996) (citations omitted); *see also id.* (collecting authority applying

rule in context of prior depositions, sworn testimony before state agency, and interrogatory

answers). The rule applies only in cases in which the party's "statements are inherently

inconsistent and in which the contradiction is not the result of an honest discrepancy or newly

discovered evidence." *Id.* at 1169 n.10.

The rule applies in this case, given Plaintiff's sworn testimony at his IDES hearing, in

which he gave a materially different story regarding the password issue than he does here. For example, when testifying under oath at the hearing, after being questioned whether Balazs asked Plaintiff for a password, Plaintiff acknowledged, "[W]e had gone back and forth on that." (Def. SF ¶ 23.) At the same time, Plaintiff acknowledged that he had not provided any password to the MAI team, stating that "I was under the impression that, um—we at CTS were not issuing a password to other departments." (*Id.*) The IDES referee asked a further series of questions regarding the password, and in his responses, Plaintiff acknowledged that there *was* a password, that Balazs in fact asked for it, and that Plaintiff did not provide it. (Def. SF Ex. D at 8-13.) For example, Plaintiff admitted that when Balazs asked for the password on June 20, 2001, he replied that he "told him [Balazs] that I was unable to give him the password at that time." (*Id.* at 9.) Plaintiff was further asked: "And what was – did you give him [Balazs] any reason about why you were unable to give him [the] password?" (*Id.* at 10.) To this question, Plaintiff answered, "I was unable to explain the reason to him at that time." (*Id.*) Plaintiff also offered two explanations as to why he was unable to give Balazs a reason for not providing the password: "I was un . . . I didn't give him a reason because I was not at my desk and I was unable to verify the password for him" (*id.* at 10); and "I don't know that I was able to give him a response other than I did not know what the password was at that time." (*Id.* at 11.) Throughout the hearing, Plaintiff never denied the *existence* of the password in question, but instead attempted to explain why he could not and did not give the password to Balazs. (*See* Def. SF Ex. D at 8-13.)[26] Similarly, in

---

[26] Although not material to the Court's decision, the Court notes that Plaintiff's former work colleague and friend, Paul Zielinski (who remains a current Allstate employee) testified that on Plaintiff's final day at Allstate, Plaintiff told him "he didn't feel that he wanted to let the program go, give it up with the password." (Def. Resp. Ex. at 12); *see also id.* at 25 (testifying that Plaintiff stated that "the program was password protected and he didn't want to give the

his March 2002 charge with the EEOC, filed under penalty of perjury, Plaintiff stated that he was fired for allegedly failing to give the password but that "[t]he password was not within my control because I was not permitted in the building where the system was located." (Def. SF ¶ 6; Pl. Resp. SF ¶ 6.)

By way of contrast, Plaintiff's story in the case *sub judice* markedly changed at his deposition and in his affidavit, in which he repeatedly claimed that there was *no password at all*. (*See, e.g.*, Pl. SAF ¶¶ 42-45; Def. SF Ex. B at 43, 150, 160-161; Vonckx Aff. ("Pl. Resp. Ex.") ¶¶ 13, 15, 17, 20.) However, Plaintiff cannot contrive a factual dispute over the password by admitting in his sworn IDES testimony that he did not turn over the password and then, at his deposition and in his affidavit, deny that the password even existed or that he had turned it over and had so informed Balazs. *See, e.g., Patterson*, 150 F.3d at 724 ("[A] party cannot create an issue of fact by submitting an affidavit whose conclusions contradict prior testimony."); *Bank of Illinois*, 75 F.3d at 1169 (collecting cases).[27]

In addition, Plaintiff cannot explain away his divergent deposition and affidavit testimony by arguing that these statements are merely clarifications of his prior sworn testimony at the IDES hearing. After examining the IDES testimony in its entirely, the Court concludes that there is no ambiguity in his IDES testimony in which Plaintiff conceded the existence of a password, that he did not provide it at the time he was fired, and that he did not explain why he had not

_____

password up . . . .").

[27] Although not material to the Court's decision, the Court notes that all of the other deponents in the case (Balazs, Noe, Rosado, and Zielinski), testified that Plaintiff had password-protected the "Move, Add, Change" Program. (Def. SF Ex. G at 79; Def. SF Ex. F at 34; Def. SF Ex. E at 17-18; Def. Resp. Ex. at 11-13.) Their testimony was consistent with and similar to Plaintiff's sworn testimony at the IDES hearing that Balazs had requested the password and Plaintiff did not provide it.

provided it. As a result, the Court disregards Plaintiff's contradictory deposition and affidavit testimony to the extent it contradicts unambiguous prior sworn testimony before the IDES. *See, e.g., Bank of Illinois*, 75 F.3d at 1169; *id.* at 1173 (Cudahy, J., concurring) ("When a party seeks to create an issue of fact by simply submitting an affidavit which directly contradicts a witness's prior sworn statements, a court rightly ignores the later submission since it creates no *genuine* factual dispute.") (emphasis in original).

As a result, Plaintiff's rebuttal arguments, which rest on his contention that there was no password at all and had so informed Balazs, must fail because the key inquiry is not whether Defendant's stated reason for firing Plaintiff (that he refused to turn over a password or explain why) is true, but whether Defendant *believed* its stated reason to be true or actually was lying and engaging in age discrimination. *See, e.g., Kariotis*, 131 F.3d at 676. Plaintiff offers no evidence casting doubt on Defendant's sincere belief. And, incidentally, it appears that Allstate's belief *was* well founded. Plaintiff did not provide the password in response to Balazs's June 20, 2001 email in which Balazs warned Plaintiff that his failure to do so had become a job performance issue. (Def. SF ¶¶ 24-28.) Plaintiff did not provide the password when leaving a voicemail with Balazs on June 21. (*Id.* ¶ 40.) Plaintiff did not provide the password on June 25, following the meeting in which Balazs and human resources personnel suspended Plaintiff pending an investigation. (*Id.* ¶¶ 42-43.) From these facts, there is no triable issue about whether Allstate actually believed in its stated reason for terminating Plaintiff.

Even assuming for the sake of argument that there was—as Plaintiff claims—actually no password, Plaintiff's remaining rebuttal arguments also would fail. Plaintiff's first argument in rebuttal is that Allstate did not adequately investigate the password issue, and this shows that

Allstate's stated reason for terminating him must be pretextual. (Pl. Resp. Br. at 10-11.) In particular, Plaintiff argues that Balazs should have made at least "a rudimentary inquiry" into whether the "Move, Add, Change" program was in fact password protected, whether Plaintiff delivered everything to the MAI team as he was asked, and whether Rosado's system was so outdated that the program could not be installed. (*Id.*) Plaintiff also criticizes Noe's reliance on the aforementioned string of emails in taking part in the decision to terminate Plaintiff. (*See id.* at 11.)

These arguments are without merit. Plaintiff cites to no facts in support of his conclusory assertions that Allstate's investigation was not sufficient. Even if he did, however, the Seventh Circuit has repeatedly instructed that a district court does not "sit as a super-personnel department that reexamines an entity's business decisions." *Balderston*, 328 F.3d at 324; *see also Aungst*, 937 F.2d at 1220 (under the ADEA, a company's hiring and firing practices can be "medieval," "high-handed," or "mistaken" so long as they do not discriminate on the basis of age) (citations and internal quotations omitted). Allstate investigated the password issue as it saw fit, and the Court is not entitled to second-guess Allstate's investigation and subsequent termination decision in the absence of any showing that Allstate did not honestly believe in its reasons for terminating Plaintiff. *See Kariotis*, 131 F.3d at 677 ("[A] reason honestly described but poorly founded is not a pretext as that term is used in the law of discrimination.") (internal citation omitted). Plaintiff's rebuttal must "point to facts suggesting that [Allstate] investigated [him] differently because [he] was an older employee. . . ." *Id.* All Plaintiff offers is a broadside of conclusory complaints about the alleged inadequacy of Allstate's investigation, and this simply is not adequate to show pretext. *See id.* (holding that, even if defendant's decision

arguably was wrong, and "[even if] the company was careless in not checking its facts before firing [plaintiff], . . . there is not evidence that the company approached [plaintiff's] case differently than others."); *see also id.* at 677 ("[A]rguing about the accuracy of the employer's assessment is a distraction . . . .") (citation omitted).

Plaintiff claims in his second rebuttal argument that Allstate failed to follow its own policies when it converted what was a job performance issue into a loss of confidence justifying immediate dismissal. (Pl. Resp. Br. at 11-12.) In particular, Plaintiff alleges that Allstate should have subjected him to a series of progressive disciplinary measures and that Allstate's failure to do so is evidence of discrimination. (*See id.*) This, Plaintiff argues, shows that Allstate's articulated reason for terminating him is merely a pretext. (*See id.*)

This argument also fails. While it is true that a company's failure to abide by its procedures in the case of a particular employee may sometimes support an inference of pretext, *see Giacoletto v. Amax Zinc Co.*, 954 F.2d 424, 427 (7th Cir. 1992), this is not such a case.[28] It is undisputed that Allstate originally considered Plaintiff's lack of cooperation on the password

---

[28] In *Giacoletto*, unlike the instant case, the plaintiff-manager was retained at his job for fourteen years while getting bad reviews for the factor that allegedly prompted his dismissal, and moreover his department was achieving excellent productivity while operating within its budget at the time of his firing, so the company's failure to follow its policies concerning the allegedly problematic and long tolerated factor was suspicious. 954 F.2d at 427. In this case, by way of contrast, Plaintiff was fired virtually immediately after failing to provide the password. And prior to the password incident, Balazs was giving Plaintiff the highest marks in his reviews, which itself casts doubt on any notion that Balazs (who, at 43, was the same age as Plaintiff) was looking to discriminate against Plaintiff on the basis of his age. *See Hong v. Children's Mem'l Hosp.*, 993 F.2d 1257, 1266 (7th Cir. 1993) ("We find it implausible that [the plaintiff's supervisor] would begin to treat the plaintiff in a pejorative manner because of the plaintiff's national origin after eight years . . . especially when . . . [the supervisor] rated the plaintiff's performance as exceeding the hospital's expectations" for multiple years prior to problems that allegedly led to plaintiff's termination.).

issue to be a "job performance issue," for which Allstate's human resources policy 4.1 would require Allstate to initiate progressive discipline before terminating Plaintiff. (Def. SF ¶ 26; Def. SF Ex. H at VON 103.) It is also undisputed, however, that as of June 22, 2001, Allstate changed its assessment of the password dispute from a job performance issue to one of *misconduct* on Plaintiff's part. (Pl. SAF ¶ 66; Def. SF ¶¶ 45-46.) Thus, Plaintiff's direct management group lost confidence in Plaintiff's ability to perform his job because Plaintiff was "deliberately ignoring a request to provide necessary password information. . . ." (Def. SF ¶ 45.) This type of misconduct falls under Allstate's human resources policy 4.2 (entitled "Conduct Leading to Immediate Termination"), which identifies certain sufficiently grave misconduct to which the progressive disciplinary policy is inapplicable and for which immediate termination may be appropriate. (Def. SF Ex. H at 103-04.)[29] Thus, Allstate did not violate its own established policy when it terminated Plaintiff, and thus Plaintiff's argument that such violation is evidence of pretext fails.

Plaintiff cannot show Allstate's stated reasons for terminating him to be pretextual, because he has failed to provide specific facts showing that Allstate did not give an honest, nondiscriminatory explanation for terminating him. Perhaps Allstate was impatient in its treatment of Plaintiff. Perhaps Allstate should have been more tolerant of Plaintiff's refusal to comply with requests, especially given that Plaintiff's grandfather was terminally ill. Perhaps Allstate gave unwarranted short shrift to Plaintiff's excuses for not providing the password. And perhaps the Court would have treated Plaintiff differently if he had been the Court's employee.

---

[29] Also included under the "Conduct Leading to Immediate Termination" is engaging in harassing or discriminatory conduct "based on sex, race, color, religion, age, disability, citizenship, national origin, [and] sexual orientation." (Def. SF Ex. H at 103.)

But even if all of these speculations are true, none gives rise to an inference of age discrimination in violation of federal law. "It is well settled in [the Seventh Circuit] and other circuits that an employer may terminate an employee for any reason, good or bad, or for no reason at all, as long as the employer's reason is not proscribed by a Congressional statue." *Kahn v. United States Sec. of Labor*, 64 F.3d 271, 279 (7th Cir. 1995); *see also Balderston*, 328 F.3d at 323 ("[E]mployers may terminate competent employees older or otherwise because they do not like them.") (citation and internal quotation marks omitted); *Kariotis*, 131 F.3d at 677 ("No federal rule requires just cause for discharges."). In short, Allstate has articulated a legitimate, nondiscriminatory reason for terminating Plaintiff. Plaintiff has not provided any evidence to the contrary by which a reasonable jury could find otherwise.

## IV.    CONCLUSION

Plaintiff has not pointed to any facts raising a genuine material issue that would defeat Allstate's motion for summary judgment. For the reasons set forth above, Allstate's motion for summary judgment is GRANTED.

So Ordered.

_____
Mark Filip
United States District Judge
Northern District of Illinois


Dated: ___JUN 2 2 2004___